Sucesión Cabrera et al., Demandantes y Apelados, *v.* Aponte, Demandado y Apelante.

Apelación procedente de la Corte de Distrito de Ponce en pleito sobre cobro de dinero, precio de finca rústica con intereses.

No. 2225.—Resuelto en julio 28, 1921.

Contratos—Nulidad de—Demencia—Incapacidad Mental—Presunción Prima Facie.—Son nulos los contratos celebrados por personas incapaces para ello a causa de demencia. Declarada judicialmente incapaz una persona por haberse demostrado que padecía de enajenación mental y celebrado un contrato por esa persona después de hecha tal declaración, bastará la simple presentación de ésta para obtener la nulidad del contrato, pues dicha decla-

ración es prueba *prima facie de la incapacidad,* pero tal prueba puede ser destruída, como sucedió en este caso, por otra clara y robusta que demuestre que en realidad de verdad la persona declarada incapaz estaba en el pleno dominio de. sus facultades mentales cuando se celebró el contrato.

Los hechos están expresados en la opinión.

Abogados de los apelados: *Sres. López de Tord* y *Zayas Pizarro.*

Abogados del apelante: *Sres. José A. Poventud* y *Alberto S. Poventud.*

EL JUEZ ASOCIADO SR. DEL TORO, emitió la opinión del tribunal.

Se trata de una apelación contra una sentencia que condenó al demandado a pagar a los demandantes la suma de catorce mil quinientos dólares, con más los intereses legales de esa suma desde el 14 de marzo de 1910 hasta su completo pago y a rendirles cuenta de los frutos de determinada finca rústica desde el 21 de enero de 1901 hasta el dicho 14 de marzo de 1910. El origen de esos pronunciamientos está en que la finca a que se refiere el pleito fué adquirida por el demandado de la causante de los demandantes, quien, al tiempo de la transferencia, había sido declarada judicialmente incapaz a causa de locura.

Para pedir la nulidad del contrato de venta otorgado por la dicha causante, doña María Mercedes Cabrera, sus herederos no solamente alegaron en la demanda que dicha señora había sido declarada incapaz a causa de demencia, sino que estaba realmente demente al otorgarla y continuó así hasta su muerte, y que al demandado constaba tal estado de locura.

Y para explicar los demandantes por qué no ejercitaban la acción reivindicatoria contra el actual poseedor de la finca, alegaron que el demandado, que tenía inscrita dicha finca a su favor en el registro, la vendió a Carlos Toro Labarthe por la suma de catorce mil. quinientos dólares y que Carlos Toro a su vez la vendió a la corporación llamada "Santa Isabel Sugar Company" que la posee actualmente; ignorando

dichos compradores el vicio de nulidad que tenía el título del vendedor Aponte.

El demandado contestó negando las alegaciones de la demanda y a su vez alegando ocho defensas, a saber: 1, que compró la finca por escritura pública, por precio suficiente que pagó, dando fe el notario de la capacidad de los otorgantes, y estando en efecto en su cabal juicio la vendedora que luego en varias ocasiones ratificó la venta; 2, que aún suponiendo a la vendedora incapacitada, tal incapacidad cesó cuando contrajo matrimonio en julio 14, 1900; 3, que aún aceptando que la vendedora hubiera sido incapaz a causa de demencia, es lo cierto que al otorgar la escritura actuó en un intervalo de lucidez; 4, que el demandado compró la finca de quien la tenía inscrita a su favor en el registro, sin que en éste constara la incapacidad mental de la vendedora y sin que nada personalmente supiera sobre tal incapacidad; 5, que el expediente en el cual fué declarada incapaz la vendedora caducó por inacción en el mismo por más de cuatro años; 6, que los demandantes y su causante incurrieron en *laches* por haber dejado transcurrir más de diez y seis años sin ejercitar su acción; 7, que la acción para pedir la nulidad del contrato ha prescrito, por el transcurso de cuatro años; y 8, que en todo caso el demandado adquirió la finca por prescripción por haberla poseído en concepto de dueño, pacífica, pública e ininterrumpidamente, con buena fe y justo título, por más del tiempo necesario de acuerdo con los artículos 1858, 1861, 437 y 450 del Código Civil Revisado y Orden Judicial de abril 4, 1899.

Fué el pleito a juicio. Se practicó una larga prueba documental, pericial y testifical y la corte finalmente dictó la sentencia a que nos hemos referido.

Para fundar su sentencia el juez emitió una opinión y en ella declaró probado que la Sra. Cabrera falleció en Ponce de "meningo encefalitis crónica," según certificación facultativa, el 30 de mayo de 1913, siendo sus herederos los de-

mandantes; que dicha señora sufrió de demencia y fué por ello declarada incapaz por resolución judicial de 4 de marzo de 1899, habiendo fallecido en estado de locura; que era dueña de la finca de que se trata en el pleito y en enero de 1901 asistida de su esposo la vendió por ante notario al demandado en mil setecientos dólares, sin que al notario ni al demandado constara que la vendedora tenía perturbadas sus facultades mentales, y que luego, en 1910, el demandado vendió la finca en catorce mil quinientos dólares a Toro Labarthe y éste a la Santa Isabel Sugar Company, cuyos compradores nada conocían con respecto a la locura de la Sra. Cabrera.

A virtud de los anteriores hechos, que se basan en realidad de verdad en la prueba, quedaba eliminado el elemento de fraude que se imputó al demandado en la demanda, debiendo por tanto partirse de la base de que quedó demostrado que al demandado no constaba en el momento de contratar que la persona que le vendió la finca padeciera de enajenación mental.

Luego la corte dice:

"La cuestión principal en este caso, es resolver si cuando se hizo la escritura de venta por doña María Mercedes Cabrera y Martorell a favor de don Manuel Aponte y Cintrón, dicha vendedora estaba o no incapacitada. Sobre este punto versó la mayor cantidad de prueba presentada por ambas partes, consistente en documental, testifical y de peritos médicos. La evidencia sobre este punto ha sido altamente contradictoria, y después de un estudio largo y detenido de la misma, la corte hablando con toda honradez y franqueza, hace constar que no ha podido llegar a resolver el conflicto de evidencia, de una manera satisfactoria; es decir, que no ha podido llegar a la conclusión de si doña María Mercedes Cabrera Martorell, en el acto de otorgar la escritura de venta al demandado Manuel Aponte y Cintrón, estaba en un momento de lucidez o si no lo estaba. Pero hay un hecho muy importante de los probados en el juicio, y es: que doña María Mercedes Cabrera y Martorell fué declarada legalmente incapaz, con arreglo a la ley, por una sentencia que dictó el Juzgado de Primera

Instancia de Ponce, el día 14 de marzo de 1899; no habiéndose pro-
bado en el juicio que hubiera sido dicha señora, posteriormente, re-
habilitada o declarada capacitada, de acuerdo también con la ley.
Y así las cosas la corte encuentra que es de perfecta aplicación al
presente caso, la doctrina sentada en la sentencia del Tribunal Su-
premo de España, de 21 de octubre de 1897, reportado en el tomo 82
de Jurisprudencia, página 491 a 496. Dicho caso guarda gran ana-
logía con el presente, notándose únicamente la diferencia de que la
finca objeto de la venta no había pasado a tercero por lo que sola-
mente cupo ejercitar como se ejercitó, la acción de 'nulidad de con-
trato de venta.' En dicha sentencia del Tribunal Supremo de Es-
paña, se encuentra el siguiente considerando: 'Que es de todo punto
improcedente el motivo segundo, puesto que es notorio que en 1885
como hoy las declaraciones de incapacidad podían y pueden hacerse
sumariamente, según los artículos 1848 de la Ley de Enjuiciamiento
Civil y 218 del Código cuando no existe contradicción, y *que una vez
hecha surte sus efectos mientras no se revoque en forma de dere-
cho;* en cuyo concepto, declarada la incapacidad de los hermanos An-
tonio y Juan González desde aquella fecha, es claro que no pudieron
celebrar válidamente en 1892 los contratos de que se trata.' Por la
anterior doctrina se llega a la conclusión que toda vez que no se ha
probado la sentencia de incapacidad de doña María Mercedes Cabrera
y Martorell, dictada por el Juzgado de Primera Instancia de Ponce
en 4 de marzo de 1899, haya sido revocada en forma de derecho,
dicha señora no pudo celebrar válidamente contrato alguno de venta
el año 1901 a favor del demandado señor Aponte, a no ser que ella
hubiera estado asistida por su tutor.''

Se ve, pues, que el fundamento decisivo que tuvo la corte
de distrito para declarar con lugar la demanda, fué la doc-
trina del Tribunal Supremo de España contenida en su sen-
tencia de 21 de octubre de 1897. Examinemos dicha sen-
tencia.

En 1885 Antonio y Juan González Higuera adquirieron
por herencia varias fincas y en el propio año su hermano
Francisco inició un expediente judicial para que se declarara
la incapacidad de los dichos Antonio y Juan y se le nom-
brara curador de los mismos. La incapacidad fué declarada
y el curador nombrado, recogiendo y teniendo éste en su

compañía hasta su muerte, ocurrida en 1 de abril de 1892, a sus hermanos incapaces.

En 23 de julio de 1892 los dichos Antonio y Juan comparecieron ante notario que dió fe de su capacidad y vendieron a Manuel González ciertas fincas. El comprador no pagó un precio fijo en dinero por ellas, sino que se obligó a alimentar, calzar y vestir a los vendedores hasta que falleciesen, siéndole prohibido enajenar a su vez las fincas mientras viviesen los vendedores. En el registro de la propiedad no constaba la incapacidad de los vendedores y las ventas fueron inscritas.

Así las cosas, en agosto de 1892 se constituyó el consejo de familia de los hermanos Antonio y Juan, se nombró tutor a los incapacitados y acto seguido el tutor inició un pleito para que se declarase la nulidad de las ventas y se decretase la cancelación de las inscripciones que causaron en el registro y la devolución de las fincas, sin nada restituir los incapaces porque en nada se enriquecieron.

Contestó el demandado alegando "que negaba la incapacidad de los hermanos González Higuera, con todas sus consecuencias, y mientras no se demostrara que se hallaban en tal estado de incapacidad al tiempo de otorgar las escrituras susodichas en las que daba fe de lo contrario el notario y los testigos instrumentales, se opondría al despojo de que se le quería hacer víctima."

En la vista no sólo se tuvo en cuenta el expediente de incapacidad sino que se presentó prueba pericial y testifical y de reconocimiento por tres médicos y luego por el juez, y se dictó sentencia de conformidad con las pretensiones del tutor. Fué finalmente en casación el pleito al Tribunal Supremo de España y dicho tribunal confirmó la sentencia. El considerando que contiene la jurisprudencia atinente, consta ya transcrito en la opinión del juez sentenciador aunque omitiendo la última parte del mismo que dice así:

" \* \* \*  mucho más cuando resulta, por la manifestación unánime de peritos y hasta por observación judicial, que subsiste realmente dicha incapacidad y que ésta es consecuencia de causas permanentes que les imposibilitan de prestar el libre consentimiento necesario para la validez de las obligaciones, por lo cual es también improcedente la referida alegación.''

Basta la anterior exposición, para penetrarse enseguida de la justa relación que guardaron los hechos y la ley en el caso decidido por la Corte Suprema de España. La acción se entabló en beneficio de los mismos incapacitados. Transcurrió muy poco tiempo entre la celebración del contrato y. la petición de nulidad. Y no sólo la corte aplicó el principio de que la incapacidad había sido declarada judicialmente, sino que por la declaración unánime de peritos y por su propia observación se cercioró de que la incapacidad subsistía y lo que es más se debía a *causas permanentes*. Como tendremos ocasión de observar, el caso sometido a nuestra consideración y resolución es bien distinto en cuanto a las circunstancias concurrentes en el mismo, pero si los casos no pudieran distinguirse y si la sentencia del Tribunal Supremo de España se interpreta en el sentido absoluto de fijar la jurisprudencia estricta de que una vez que la incapacidad ha sido declarada judicialmente, débase o no a causas permanentes, tal incapacidad debe darse por establecida sin que haya lugar a impugnarla en un pleito y todos los contratos otorgados por el declarado incapaz deben considerarse nulos irrespectivamente del hecho de si era en realidad incapaz o no el otorgante en el momento del otorgamiento, entonces nos vemos obligados a expresar que no estamos conformes con esa jurisprudencia. La realidad de las cosas debe prevalecer. Hecha la declaración, existe la presunción *prima facie* de la incapacidad, pero tal presunción puede ser destruída, en propios casos y con prueba clara y robusta que lleve al juzgador al convencimiento de lo contrario.

La jurisprudencia americana sobre la materia es mucho más abundante que la española.    Ruling Case Law la resume así:

"La antigua doctrina de las cortes inglesas de que a una persona no se le permitiría alegar su propia locura para evadir un contrato hecho por ella, ha sido uniformemente rechazada en este país, y, de hecho, algunas de las cortes americanas han adoptado la otra posición extrema y han resuelto que los contratos celebrados por una persona demente son absolutamente nulos.    Este criterio se basa en la idea de que si la persona está demente, no tiene voluntad inteligente que pueda ejercitar, y que por tanto el elemento del consentimiento falta en el contrato.    Sin embargo, de acuerdo con el gran peso de las autoridades hoy día, el contrato de una persona demente hecho antes de declararse su demencia y del nombramiento de un tutor, está considerado sólo como anulable pero no como nulo.    Los contratos hechos por una persona demente después que ha sido debidamente declarada demente son generalmente considerados absolutamente nulos, siendo la investigación de la demencia considerada como un aviso, efectivo o interpretativo, a todo el mundo, del hecho de tal demencia.    Hay, sin embargo, decisiones al efecto de que tales contratos son nulos sólo *prima facie,* y que la declaración de demencia no es prueba concluyente de ella.    Así también se ha resuelto que el contrato de una persona demente, hecho después de la investigación no es nulo, sino meramente anulable, si la tutela ha sido prácticamente abandonada, o no se ha nombrado tutor alguno, o el tutor ha renunciado sin que se le haya nombrado un sucesor."

Para un estudio más amplio, véase la nota al caso de *Flach* v. *Gottschalk Company,* 71 A. S. R. 425.

La regla generalmente aplicada por las cortes americanas ha sido, pues, la de distinguir el caso en que la incapacidad no ha sido declarada de aquél en que lo ha sido, considerando en este último totalmente nulo el contrato.    Pero la realidad se ha impuesto en muchas ocasiones y el espíritu de justicia ha prevalecido permitiéndose la investigación de la verdad para fallar de conformidad con ella el caso concreto sometido.

Se ha decidido por la Corte Suprema de Georgia en el

caso de *Field* v. *Lucas,* 68 Am. Dec. 465, y por la Corte de
Apelaciones de South Carolina en el de *Sims* v. *McLure,*
70 Am. Dec. 196, que los contratos celebrados por dementes
después que se ha hecho una investigación y la incapacidad
ha sido declarada, son nulos *prima facie,* no siendo la inves-
tigación evidencia concluyente de la locura.

En el caso de Georgia la corte inferior no permitió que
se presentara prueba de la capacidad, por haberse declarado
ya la incapacidad y nombrado un tutor al incapaz. La Corte
Suprema revocó la sentencia apelada, y dijo en su opinión:

"¿Aunque el nombramiento de tutor permaneció sin revocarse,
era pertinente por parte del demandado probar que el demente podía
contratar? Las autoridades están en conflicto sobre este punto. En
los diferentes Estados de este país el estatuto prescribe que al así
solicitarse, los idiotas, lunáticos, ebrios y otras personas de mente dese-
quilibrada pueden quedar bajo tutela; y en tales casos la declaración
de demencia por una corte competente y el consiguiente nombramiento
de tutor es prueba concluyente de desequilibrio mental para que todos
los subsiguientes contratos celebrados por el demente queden nulos:
*Leonard* v. *Leonard,* 14 Pick, 280; *McDonal* v. *Morton,* 1 Mass. 543;
*Fitzhugh* v. *Wilcox,* 12 Barb. 235; *Wadsworth* v. *Sherman,* 14 Id.
169; *L'Amoureux* v. *Crosby,* 2 Paige, 422 (22 Am. Dec. 655); menos
en casos de cosas absolutamente necesarias que han sido suministra-
das al demente en circunstancias especiales: *McCrillis* v. *Bartlett,* 8
N. H. 569. Pero las autoridades no están acordes aún en este país.
En el caso de *Hart.* v. *Deamer,* 6 Wend. 497, se resolvió que una in-
vestigación practicada de acuerdo con un auto *de lunatico inquirendo*
es admisible aunque no es prueba concluyente para demostrar la
demencia de un deudor en una acción en cobro de una deuda por
virtud de una fianza. Y el Juez Presidente Sr. Savage, que emitió
la opinión de la corte, hizo referencia a los casos de *Baley* v. *Bates,*
8 Johns. 186; *Jackson* v. *Gilchrist,* 15 Id. 98; *Van Cleef* v. *Fleet,*
Id. 147; y dijo que muchos más pudieran citarse en los cuales habían
sido recibidas investigaciones por ser prueba pertinente aunque no
concluyente. Así, pues, en el asunto de Gangwere's Estate, 14 Pa.
St. 417 (53 Am. Dec. 554), la corte resolvió que una investigación
sobre demencia en la que se declaraba que la parte estaba demente
sin tener intervalos lúcidos es prueba *prima facie* pero no conclu-
yente; y que un peticionario en el procedimiento que también fué

testigo no está impedido de atestiguar la verdad en contra del mismo y probar que la parte tuvo intervalos de lucidez. Y en el caso de *Hutchinson* v. *Sandt,* 4 Rawl. 234 (26 Am. Dec. 127), se resolvió que uno de los comisionados mismos no estaba impedido y que la declaración era solamente prueba persuasiva.

"En el caso de *Hopson* v. *Boyd,* 6 B. Mon. 296, la corte resolvió que una investigación de demencia constituye solamente prueba *prima facie* contra extraños, y merece poca consideración en Kentucky, a menos que declare que la persona es un idiota de nacimiento. La misma doctrina se sostiene en el caso de *Doe ex dem. Aber* v. *Clark,* 10 N. J. L. 217, o sea, que una investigación de demencia no es concluyente contra ninguna persona que no sea parte en ella y que al admitirse como prueba la parte contra quien se utiliza puede presentar prueba de que el supuesto demente era de sano juicio en cualquier período de tiempo comprendido en la investigación.

"En Inglaterra se considera la regla bien establecida por el Sr. Shelford en su obra sobre demencia, página 290, y por el Sr. Story en su tratado sobre contratos, de que una investigación sólo establece prueba presuntiva de demencia en cuanto a terceros. Véanse también los casos de *Sergeson* v. *Scaley,* 2 Atk. 412, 413; Collison on Lunacy, 389, secs. 1-3; *Faulder* v. *Silk,* 3 Camp. 126; *Ex parte Barnsley,* 3 Atk. 184; *Hall* v. *Warren,* 9 Ves. 605; 2 Madd. Ch. 738; *Lowe* v. *Jolliffe,* 1 W. Black, 365.

"Algunas de las cortes (véase el caso de *Leonard* v. *Leonard,* 14 Pick. 280) en este país expresan la razón por la cual la regla Inglesa no es de aplicación aquí. No podemos convencernos de la veracidad de esta suposición. Aunque consideramos los peligros por no decir los grandes inconvenientes que han de resultar de no declarar que la sentencia del juez es concluyente hasta tanto el nombramiento de tutor sea revocado, sin embargo, como la doctrina parece estar bien establecida en Inglaterra y nuestras mismas cortes son de distintos criterios, creemos que lo más adecuado es tal vez resolver que la investigación no es concluyente respecto a terceros que no son partes en ella; sin embargo, debemos decir que exigiría la prueba más clara y satisfactoria de que el supuesto demente estaba cuerdo, y se le consideró en un contrato celebrado con él en una fecha comprendida en el nombramiento de tutor. En cuanto a mi mismo me encuentro en libertad de decir que no estoy enteramente satisfecho con la sentencia, y no sé que mis compañeros puedan tener cierta predisposición con esta conclusión. Quizás la Legislatura haría bien en tomar cartas en este asunto." 68 American Decisions, págs. 466-468.

Véanse también las siguientes decisiones: *Johnson's Committee* v. *Mitchell*, 142 S. W. 675; *Witty* v. *State*, 153 S. W. 1146, y *Taylor* v. *Taylor et al.*, 93 N. E. 9.

Otra línea de autoridades representada por las cortes de Texas y Minnesota ha aceptado como regla que una vez declarada la demencia y nombrado el tutor, los contratos celebrados por el declarado incapaz son nulos, pero en aquellos casos en que la tutela ha sido prácticamente abandonada, han resuelto que la regla no se aplica y debe decidirse el asunto de acuerdo con la realidad de los hechos. Y así en el caso de *Thorpe* v. *Hanscom*, 64 Minn. 201, la Corte Suprema de Minnesota, por medio de su Juez Presidente Start, se expresó como sigue:

"La ley en cuanto a los contratos, incluyendo escrituras e hipotecas, de una persona demente, está bien establecida. La escritura de una persona demente que no esté bajo tutela no es nula sino sólo anulable, pero mientras ella está bajo tutela efectiva y subsistente se le presume concluyentemente incompetente para hacer un contrato válido en relación con su propiedad, aunque de hecho esté cuerda al tiempo de hacerlo. Esta regla está basada en una conveniencia y necesidad, para la protección del tutor, y para que pueda debidamente cumplir con sus deberes de tal. Sin esta regla sería difícil, sino imposible, para el tutor el llevar a cabo su comisión, pues en cada acción relativa a la propiedad del pupilo podría obligársele a comparecer ante el jurado a discutir la cuestión de la cordura del pupilo, y un jurado podría llegar a una conclusión y otro a otra distinta. *Leonard* v. *Leonard*, 14 Pick, 280; 2 Greenleaf, Ev. sec. 371. Ahora bien, cuando no hay razón para la regla, ésta no se aplica. Así, si no hay de hecho ninguna tutela efectiva y subsistente, y la misma ha sido prácticamente abandonada, y la persona que había estado bajo tutela después de tal abandono hace una escritura en una época en que de hecho está cuerda, y el contrato es justo, la escritura será convalidada, aunque el tutor no haya sido destituído por acción judicial. *Elston* v. *Jasper*, 45 Tex. 409.

"El mal y la injusticia de declarar nulo el contrato de una persona puesta bajo tutela durante se demencia, verificado después que la tutela ha sido de hecho abandonada, y cuando tal persona estaba cuerda, se patentizan enfáticamente por los hechos de este caso, en

el que el demandado estaba de hecho ·cuerdo, y en posesión de su propiedad, dedicado al negocio de comerciante, también al de compra y venta de propiedades reales, y había vendido ejecutando sus hipotecas desde tres años antes de constituirse la hipoteca en cuestión, sin objeción alguna ni reclamación de sus derechos por parte del tutor. El permitir al demandado bajo tales circunstancias repudiar todos sus contratos celebrados durante esos tres años, simplemente porque su tutor no había sido formalmente destituído por la corte, sería una burla de la administración de justicia. Es cierto que la corte sentenciadora nunca expresamente concluyó que al tiempo de la hipoteca no había de hecho tutela alguna subsistente, y que la misma había sido prácticamente abandonada, pero tal es la inferencia y conclusión necesaria de los hechos declarados probados. De aquí que habiendo sido constituída la hipoteca después que la tutela había de hecho terminado y había sido prácticamente abandonada, y en una época en que el demandado estaba cuerdo, la misma es válida." *Thorpe v. Hanscom,* 64 Minn. 205-206.

La incapacidad mental en el presente caso se declaró a virtud de padecer la entonces señorita Cabrera de *locura circular*. Esta es una enfermedad curable. Por lo menos todos los peritos que declararon en el juicio y las autoridades sobre la materia están conformes en que las personas que sufren de tal clase de locura, tienen intervalos lúcidos de días, de meses y aún de años, en los cuales funciona perfectamente su razón. Siendo esto así, no debiéndose la incapacidad a *causas permanentes*, se impone con mayor justicia la aplicación de la regla que permite la prueba de la capacidad no obstante la previa declaración. Además, esa fué la posición asumida por los propios demandantes y esa fué la teoría que se desarrolló en el juicio. Los demandantes no se limitaron a presentar el expediente de incapacidad como prueba. Introdujeron testigos y peritos y documentos para demostrar que la incapacidad subsistía en el momento del contrato cuya nulidad solicitaban, y no se opusieron a que el demandado presentara su evidencia con objeto de probar la capacidad.

Por otra parte surge tan claro de la prueba que nada

hizo el tutor para proteger la persona y bienes de su pupila, que el caso podría comprenderse dentro de la excepción establecida por las cortes de Minnesota y Texas.

Habiendo llegado a las anteriores conclusiones ¿qué actitud debemos asumir? ¿Procede la devolución del pleito a la corte de distrito de su origen para que lo decida resolviendo el conflicto de la prueba, o que nosotros, que ante nos tenemos los elementos necesarios, dictemos la sentencia que deba dictarse analizando y pesando por nosotros mismos la evidencia? El juez sentenciador ha sido sustituído por otro que estaría en las mismas condiciones que nosotros y el asunto se dilataría indebidamente, teniendo que concederse quizás otra apelación para ante nosotros mismos y estaríamos entonces obligados a analizar la prueba. Ambas partes tuvieron su día en corte y los autos revelan una defensa cumplida de los intereses envueltos. El pleito fué fallado finalmente y de acuerdo con la ley la apelación fué establecida. Bajo esas circunstancias, creemos que debemos resolver sin más demora definitivamente el pleito.

La prueba ocupa más de trescientas páginas. Los demandantes introdujeron la declaratoria de herederos, las copias de la escritura cuya nulidad se pide y de los posteriores traspasos de la finca, el expediente de incapacidad de María Mercedes Cabrera y la certificación de su defunción, las declaraciones de diez testigos y las opiniones de tres peritos médicos.

El expediente de incapacidad fué iniciado el 20 de enero de 1899 por Carmen Cabrera Rodríguez, tía de María Mercedes. Se acompaña al escrito una certificación del doctor Villaronga creditiva de que María Mercedes ''hace tiempo está sufriendo de enajenación mental presentando su afección el tipo de la llamada locura circular'' y otra del doctor Chacar creditiva de que venía ''padeciendo de una vesania de carácter hipocondriaco, con frecuentes perturbaciones psíquicas y principalmente volutivas, teniendo algunas remisio-

nes de pequeñas curaciones.'' El juez nombró peritos a los
doctores Amadeo y Salicrup y el consejo de familia al Dr.
Villaronga. Los· peritos declararon conjuntamente que Ma-
ría Mercedes ''en la actualidad sufre de enajenación mental
presentando el tipo de locura circular con períodos de exita-
ción y depresión.'' Informó el consejo de familia en sentido
favorable a la declaración de incapacidad. El juez examinó
personalmente a María dirigiéndole ''infinidad de preguntas
a las que dicha joven contestaba de un modo incoherente,
acompañando a sus palabras cierta sonrisa sin relación nin-
guna con la conversación que con ella se sostuviera revelando
falta de memoria de cuantos hechos fácilmente debiera re-
cordar,'' y el 4 de marzo de 1899 se dictó el auto declarando
la incapacidad. El consejo de familia nombró tutor a Pedro
M. Descartes y el nombramiento se inscribió en el Registro
de Tutelas de la corte, el 24 del mismo mes y año.

A grandes rasgos, pueden resumirse las declaraciones de
los testigos de la parte demandante, así: conocieron a María
Mercedes y a juicio de ellos estaba loca. Salía andrajosa,
despeinada. Se destrozaba los vestidos y se halaba el pelo.
Variaba el tema de la conversación. Se reía y gritaba sin
motivo. Hablando, salía con disparates. Pronunciaba pa-
labras deshonestas y algunas veces se presentó semidesnuda.
En algunas ocasiones la tenían encerrada. ·Lloraba sin mo-
tivo, y según su prima Julia, una de los demandantes, decía
que ''era madre de las pulgas.'' Las declaraciones de los
testigos se refieren generalmente a un período alrededor del
expediente, pero algunas abarcan fechas en que ya estaba
María Mercedes casada y había otorgado la escritura.

El doctor Villaronga, examinado directamente por los de-
mandantes se limitó a confirmar el hecho que constaba de
la certificación de defunción, esto es que María Mercedes mu-
rió de meningo encefalitis crónica, agregando que dicha en-
fermedad era ''el verdadero sustratum anatómico de la pa-
rálisis general progresiva.'' Los doctores Ferrán y Pérez

Marchand se presentaron en la contra prueba y a sus declaraciones nos referiremos luego.

El demandado presentó los protocolos en donde estaban originales la escritura de venta, la de cesión de crédito hipotecario y la notificación de la cesión al deudor con las firmas auténticas de María Mercedes. Se tomó una fotografía de ellas que se elevó a este tribunal. ·

Presentó también el demandado una certificación creditiva del matrimonio de María con Salvador Valls celebrado el 14 de julio de 1900 ante el Juez Municipal de Ponce y testigos; otra demostrativa de que la incapacidad de María Mercedes no se anotó en el libro de incapacitados del registro, ni en los libros generales del mismo, y otra de cierta moción de insolvencia suscrita y jurada por María Mercedes en un pleito de divorcio iniciado por ella en 1907. Además, la escritura de venta con nota de haber quedado inscrita en el registro desde marzo 16, 1901.

Sus testigos declararon sobre varios hechos. En una forma general manifestaron muchos que conocieron a María Mercedes antes y después de casada y nada pudieron observar en ella que les llevara a la conclusión de que estaba loca, al contrario, a juicio de ellos, estaba cuerda. Se refieren algunos a cierto incidente ocurrido cuando la guerra hispano-americana. Vivía la familia Descartes, de la cual formaba parte María, que era huérfana, en el campo. Alguien dijo que los soldados venían persiguiendo al Sr. Descartes y la familia salió corriendo metiéndose todos en un horno de cal. María se asustó muchísimo. Se entristecía. Se ponía a tejer y de pronto lloraba. Tal estado duró como un año.

Otros testigos declaran con respecto al matrimonio de María. El tutor estaba ausente, la familia se opuso y ella salió de la casa con su prometido en coche. Fueron a buscar la madrina, una tía de María que no vivía en la casa, y todos se dirigieron al juzgado. María se condujo bien en todos esos actos.

Juan Santiago conoció a María antes y después de casada. Cuando soltera iba al comercio que en el barrio de Descalabrado, Santa Isabel, cerca de la casa de Descartes, tenía el testigo, conversaba con él y nada anormal notó en ella. Luego de casada fué a verlo expresamente para proponerle la venta de la finca "Cercado de María" en dos mil pesos y el testigo rehusó. Nunca supo que estuviera ni que hubiera sido declarada loca. Supo después que Aponte, el demandado había comprado la finca.

Luis Casals manifestó que siendo soltera María Mercedes le encomendó varias veces el cobro de los arrendamientos de su finca, llevándole los recibos escritos por ella. Se expresaba correctamente. La vió después de casada y a su juicio estaba bien. En relación con esos arrendamientos presentáronse tres cartas de 1896 dirigidas por María Mercedes a su arrendatario pidiéndole aumento de precio y expresándole que otras fincas del mismo barrio producían más y otros particulares.

La declaración de Manuel Vidal Sánchez, protocolista, abarca hechos que se refieren al momento del otorgamiento de la escritura y a antes. Dice que María Mercedes siendo aún soltera personalmente le encomendó que le buscara la hijuela de la herencia de su padre. Describe el testigo con muchos detalles el acto del otorgamiento y a María Mercedes actuando en todo como una persona de sano juicio y explica que puede recordarlo así porque había trabajado para María y había quedado prendado de ella, y no podía fácilmente olvidarla.

Dos testigos de la escritura declararon. Uno, Elías Concepción, dijo: "Yo estaba en la notaría un día en diligencias mías y yo la conocía de vista a esa señora (se refiere a la Sra. Cabrera) y ella me dijo que si le hacía el favor de firmar esa escritura como testigo," y otro, el abogado López de Tord, no recordó que ocurriera nada anormal en el acto del otorgamiento.

Las cartas que a continuación se copian escritas y firmadas por la Sra. Cabrera figuran también en la prueba.  Dicen así:

"Sr. Dn. Manuel Aponte.—Apreciado señor: La presente tiene por objeto manifestarle que la cantidad que tengo en su poder habiéndose vencido su plazo, ni antes lo entriegue a nadie; esto se lo hago presente porque luego suelen suceder casos así.  Si Ud. viniese a Ponce algún día y puede ponerme a la voz, le diré detenidamente la causa de ésta.  Suplicándole al mismo tiempo la reserva pues deseo nadie lo sepa, favor que le agradeceré toda mi vida.—Sin más queda de Ud. su afma. María Mercedes Cabrera.—Ponce, marzo 19 de 1901.

"Sr. Dn. Manuel Aponte.—Apreciado señor, por segunda vez molesto su atención para decirle que le suplico encarecidamente que el dinero que tengo en su poder, no haga trato de ninguna especie, ni aún siendo mi esposo pues quiero evitar el quedar en la calle como antes le dije.—Vuelvo a suplicarle que esto no se sepa, y que me conteste si por conducto de Román recibió otra carta mía; y la dirección para ella es la que sigue Sñra. Da. Rosario Martorell calle Aurora número 17 pues en esta forma llega a mis manos sin que nadie se entere.—Sin más queda de Ud. atenta servidora María M. Cabrera.—Ponce, abril 24 de 1901.

"Sñr. Dn. Manuel A.—Muy Sñr. de toda mi consideración y respeto.  Será para Ud. extraña tal vez esta súplica, pero la necesidad y la desgracia juntas me obligan a dirigirme a Ud. no dudando que en su buen corazón tendrá acogida mi necesidad.  Dn. Manuel no sé si a sus oídos ha llegado el abandono de el que elegí por compañero que bajo el velo de la hipocresía me engañó; pero quiero ser lacónica y manifestarle en pocas palabras lo que me pasa pues se ha reducido la propiedad mía en una casita de mala muerte sin cocina y sin que afortunadamente he encontrado un sñr. de buen corazón me ha cedido un solar para ponerla pagando así casi nada pues siempre me dice que no tenga prisa por el solar.  Habiendo sabido por distintas personas, pues aunque tuve el gusto de conocerle el día que por desgracia salía de mi propiedad el día ese aunque poco tiempo nuestra conversación recuerdo su semblante y no dudo que es digno de la fama que goza, pues en la bondad de su rostro se ve retratado un corazón generoso.  Esperando Dn. Manuel que no desoiga mis súplicas ayudándome con ocho o diez pesos para poder arreglar esta casita donde he tenido que meterme; hacen 5 años que me casé y cuatro que he sido abandonada de Sarvador sin pasarme nada.  Y por solo sorprenderlo con

una querida que tiene; y como era natural le dije lo que se merecía y se ha marchado hasta la presente.   No quiero cansarle con mi historia triste, si algún día viene a Ponce le suplico pase por aquí, y quedará convencido de mi necesidad; la dirección mía es calle de Méndez Vigo número 19 sin más quedo respetuosamente de Ud. humilde Servidora María Mercedes Cabrera.''

Dando por establecidos los particulares de su prueba, el demandado interrogó a los peritos médicos doctores Villaronga, Salicrup, Salazar y de la Pila Iglesias.

El doctor Villaronga, dijo:

''Mi contestación es que estaba atravesando un período de lucidez, pero no puedo decirlo con seguridad porque no examiné la persona en aquella ocasión.   En esos momentos podía estar atravesando momentos lúcidos que se prolongaran hasta que escribió las cartas que son correctas no sólo en el sentido del contenido, sino en el mecanismo de la escritura.''

Le interrogaron entonces los demandantes así: ''Dígame doctor parece que con lectura de estas cartas que suscribió esta señora parece que usted llegó a la conclusión de que esta persona estaba completamente lúcida.''   Y contestó: ''He dicho que era posible.''   Después dijo el perito: ''No se puede afirmar que estaba lúcida ni negarlo sin un examen verificado en el momento.''   Siguió un interrogatorio sobre la clase de locura y el doctor concluyó que con examen de la causa de la muerte si tuviera que rehacer el certificado de 1899 no calificaría la locura de circular a secas, sino de parálisis general en su primer período en forma circular. ''Son dos enfermedades distintas.   La parálisis general es una enfermedad, y la locura circular es otra enfermedad, pero la primera puede revestir la forma de locura circular, no siendo posible diagnosticarlo sino por la evolución ulterior del proceso.''   Siguió dando explicaciones y los demandantes le preguntaron: ''¿Hay degeneracón de la célula?'' y el doctor contestó: ''Sí señor, atrofia, cuando llega a los últimos períodos, está el cerebro atrofiado.''

Volvió a interrogarle el demandado así: ''A pesar de

todo lo que usted ha contestado, ¿usted cree y opina que María Mercedes Cabrera Martorell en enero 21, 1901, cuando firmó la escritura estaba en un período de lucidez?'' Y el perito contestó: ''Teniendo en cuenta las circunstancias de este caso siempre creo que fuera así. * * * ''¿No puede asegurarlo?''—''No señor.'' ''¿Pero la opinión a juicio de usted cuál es?''—''Sí señor, creo y opino que estaba en razón.'' ''¿A pesar de que ella sufriera de meningo-encefalitis opina el testigo y cree, que en la fecha de la escritura y de esas cartas esta señora estaba en un momento lúcido?''—''Sí señor, absolutamente porque estos procesos tienen como características las remisiones.''

El doctor Salicrup que fué uno de los médicos nombrados por el juez para declarar en el expediente de incapacidad, dijo: ''Por los hechos y las cartas estaba la enferma si no curada, en un período de lucidez. Todos esos hechos demuestran estar ella, curada, y yo no tendría inconveniente en dar un certificado de curada.'' ''¿Usted opina que en ese momento (se refiere al del otorgamiento de la escritura) estaba en su razón y que se daba cuenta de todo lo que hacía?''—''Por esas cartas y modo de expresarse lo estaba.'' Se le preguntó si tendría inconveniente en declarar que se le podía levantar la incapacidad y el testigo contestó: ''Ningún inconveniente, porque yo tengo que comparar esos hechos con el estudio que hice de la paciente y desde luego tengo que reconocer que se ha curado o por lo menos que ha entrado en un período de lucidez.''

Luego dijo el doctor que la meningo encefalitis no es enfermedad exclusiva del loco. Expresó que María Mercedes no sufría de parálisis general progresiva, sino de locura circular. Los períodos de lucidez en esa clase de locura pueden durar semanas y años. Opina que en enero 21, 1901, María estaba ''en un período de lucidez o en completa razón.''

Los demandantes le preguntaron entonces extensamente. Le hicieron preguntas hipotéticas basadas en la situación

descrita por sus testigos, esto es, que se rasgaba los vestidos sin causa alguna, se arrancaba el cabello, trató de salir medio desnuda, ''¿que diría usted respecto al estado de este enfermo?'' y contestó: ''Podría decir que a los cuatro años más o menos, estaba en un período de lucidez y estaba cuerda * * * .''

El doctor Salazar contestó: ''Entiendo que estaba en el pleno uso de su razón y que era responsable por cuanto los documentos que se me han puesto de manifiesto me demuestran que tenía razón en ese momento. * * * Con las cartas sólo puedo juzgar que esa señora estaba en toda su capacidad. Si consideramos, pues, los hechos como están relatados en esa pregunta, podría asegurar que esa señora estaba en su completa facultad mental.''

Respondiendo al juez dijo: ''Sí señor. Nosotros consideramos los padecimientos mentales en ese tipo de locura más bien una psicosis que como enfermedad. Podría considerársele en el pleno uso de su facultad mental.

A los demandantes respondió: ''Según los hechos y esos documentos que se me ponen de manifiesto, yo opino que esa joven en ese momento (el de la escritura) era responsable, ahora bien yo para dictaminar el caso con más certeza hubiera tratado de ver qué síntomas presentaba la paciente.'' Puso de relieve la importancia de las cartas porque ellas se refieren a la escritura. A su juicio no era locura circular, ni parálisis general progresiva, lo que padecía María Mercedes. Cree que se trataba de momentos histéricos, de períodos de manía, después venía un período de lucidez y otro de histerismo.''

Tras de repetidas e insistentes preguntas terminó diciendo que no variaría en nada su criterio y que creía que ella estaba bien.

Y el doctor de la Pila Iglesias, expresó: ''Creo que la persona a que se refieren esos datos que se me han puesto de manifiesto, hay que tenerla por una persona sana y en

completo uso de su razón, y puede tenérsele por una persona completamente curada. Con ese cúmulo de datos respecto a su inteligencia y con todos esos detalles se ve bien claro que esta señora estaba en su cabal juicio, y en el pleno uso de sus facultades mentales. En todas esas tres cartas se ve que esa señora ha estado en un estado mental perfecto. De memoria, de percepción, de recuerdo, de memoria retrógrada y de memoria actual.''

La prueba del demandado abarcó además el extremo del valor verdadero de la finca al tiempo de la venta y de la actuación del comprador en relación con el contrato. A nuestro juicio quedó cumplidamente demostrado que el precio que pagó el demandado era el justo valor de la tierra en aquel entonces. Fincas colindantes se vendieron a un precio similar. Todas las circunstancias presentan además al comprador como desconocedor por completo de la declaratoria de incapacidad y como contratando con una persona a quien en el orden natural de las cosas se considera enteramente capaz. Hay en los autos un interrogatorio muy interesante. El Lcdo. López de Tord, abogado de los demandantes, fué, como hemos visto, testigo en la escritura y cuando declaró en el juicio Juan Cortada, respondiendo a las propias preguntas de López de Tord, le recordó con insistencia el hecho de que habiendo facilitado él a Aponte el dinero para adquirir la finca y queriendo estar seguro de que Aponte recibiera una buena documentación, le dió una carta para sus abogados que eran Ortiz Antón y López de Tord y a esto se debió que el último acompañara a la notaría a Aponte. Cortáda dijo que Aponte ''es el empleado más honrado que tiene hoy la Santa Isabel.''

Cuando el demandado terminó de practicar su prueba, introdujeron los demandantes las declaraciones de los peritos doctores Ferrán y Pérez Marchand. Hablaron dichos peritos ampliamente de las diferentes clases de locura y la esencia de sus declaraciones está en que a su juicio no puede

concluirse si la Sra. Cabrera estaba o no en el dominio de
sus facultades mentales cuando otorgó la escritura sin ha-
berla examinado personalmente.

Tal es la prueba aportada por las partes en este caso.
La hemos examinado detenidamente, hemos pesado todas las
circunstancias que concurren, y a nuestro juicio no es sufi-
ciente para anular el contrato. Fácil fué la posición de los
demandantes. Estaban en condiciones de presentar y pre-
sentaron sin dificultad alguna un caso *prima facie* de locura.
Difícil la posición del demandado. A través de los años,
después de haber adquirido en el curso ordinario de los ne-
gocios una finca de la persona que la tenía inscrita a su
favor en el registro sin defecto ni limitación alguno, usando
los servicios de un buen abogado, a las claras, por ante no-
tario, e inscribiendo su título sin dificultad en el propio re-
gistro; después de haber conservado en su poder por muchos
años la finca y de haberla mejorado, y después de haberla
vendido, surge ante él el hecho de la locura de una persona
a quien sólo conoció cuando fué a contratar con ella y se ve
obligado a investigar la vida de tal persona y a demostrar
su capacidad, esto es, a penetrar en los misterios de la razón
de un sér que para mayores dificultades había ya desapa-
recido del mundo de los vivos. Pero salió airoso a nuestro
juicio. Lá declaración de incapacidad no se debió a causas
permanentes. La locura circular puede curarse o por lo me-
nos permite largos intervalos de lucidez en que la razón fun-
ciona normalmente. Si María Mercedes hubiera sido la per-
sona que describen los testigos de los demandantes, incapaz
de sostener una conversación sin desvaríos, sin memoria, son-
riendo o llorando a cada instante sin motivo, no hubiera po-
dido asistir a los largos y complicados actos de la celebra-
ción de su matrimonio y del otorgamiento de las escrituras
de venta y cesión sin que el juez y el notario y los testigos
algo notaran en ella. Ni una sombra de duda existe en este

caso con respecto al proceder de esos funcionarios en tales actos.

Pero es más, Casals y el protocolista Vidal Sánchez presentan a María Mercedes con anterioridad a su matrimonio ocupándose personalmente de sus intereses, buscando la hijuela de la herencia de su padre, cobrando el arrendamiento de su finca y tratando de obtener un precio más ventajoso, actos todos que revelan una mente que se da cuenta exacta de los hechos y de las situaciones, y el testigo Santiago, vecino de María, que la conoce bien, recibe de ella misma, después de casada, la proposición de venta de su finca en dos mil pesos.

Pero aún hay más y es esta prueba la que inclina la balanza para resolver el conflicto. Nos referimos a las tres cartas escritas y firmadas por María Mercedes y relacionadas directamente con el contrato que se trata de anular. Ella, la dueña, la que vendió, recuerda perfectamente los detalles de la venta y se cuida del precio; ella, después de varios años, injuriada y abandonada por su esposo, viviendo en la miseria, vuelve el pensamiento al comprador de su finca, de su única propiedad, no para recriminarlo, no para negar el acto, al contrario, para rememorar su bondadosa faz y pedirle el auxilio de su generoso corazón. Tienen tantos detalles esas cartas, revelan un pensamiento tan concentrado y firme, sin que se observe en ellas desvarío alguno, que es imposible que fueran escritas por una persona que no estuviera en posesión de sus facultades mentales.

Seguramente no fué María Mercedes un tipo de salud. Sus padres al parecer no vivieron mucho. La misma prueba del demandado la presenta por un período de un año alrededor de la fecha del expediente de incapacidad en un estado tal que pudo servir como sirvió seguramente de base para la declaración de incapacidad. Pero la causa de esa incapacidad era transitoria. Su salud pudo mejorar y reaccionar su cerebro. Y a juzgar no sólo por la apreciación de los

hombres sino principalmente por los actos por ella realizados, por la huella imborrable que dejó en el ejercicio de sus facultades mentales, su capacidad era bastante, y anular ahora un contrato por ella realizado disponiendo de lo suyo, no ya a petición de ella misma, sino a solicitud de unos herederos colaterales presentada después de transcurridos diez y siete años, constituiría la consagración de una tremenda injusticia contra un comprador que adquirió de buena fe y pagó por la cosa el justo precio.

Debe revocarse la sentencia apelada y dictarse otra declarando la demanda sin lugar, sin especial condenación de costas.

> *Revocada la sentencia apelada y declarada sin*
> *lugar la demanda sin costas.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Aldrey y Hutchison.

El Juez Asociado Sr. Wolf firmó "Conforme con la sentencia."