VILA & HNOS., INC., demandante y recurrida, *v.* OWENS ILLINOIS DE P. R., OWENS ILLINOIS, INC., demandados y recurrentes.

Número: R-83-165          Resuelto: 21 de noviembre de 1986

*Rafael R. Vizcarrondo* y *Pedro J. Polanco,* de *Fiddler, Gonzá-
lez & Rodríguez,* abogados de la parte recurrente; *Francisco
Agrait Oliveras,* de *Agrait & Oliveras,* abogado de la parte
recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión
del Tribunal.

## I

En este recurso debemos determinar si la prueba presen-
tada por la parte demandante es suficiente para probar sus
alegaciones y para apoyar la sentencia del tribunal de instan-
cia. Si esa prueba es suficiente, entonces, debemos pasar jui-
cio sobre la corrección de las determinaciones de hecho del
tribunal de instancia.

Vila Hermanos, Inc. (en adelante Vila & Hnos.), —corporación dedicada a la transportación de piedra y arena— demandó a Owens Illinois de Puerto Rico (en adelante O.I.P.R.), —una sociedad comercial— y a Owens Illinois, Inc. (en adelante O.I.I.), —socio principal y compañía matriz de O.I.P.R.— por incumplimiento de contrato y daños y perjuicios. (¹)

El tribunal de instancia encontró probados los siguientes hechos: A mediados de 1974 O.I.P.R. comenzó conversaciones con Vila & Hnos. para el suministro de la materia prima —arena sílica y piedra caliza— necesaria para una fábrica de cristales que estaba organizando. El presidente de Vila & Hnos., el Sr. Raúl Vila, a través del Sr. Emérito González —vendedor de Kane Caribbean, Inc., empresa dedicada a la venta de maquinaria industrial— entró en negociaciones para suplir esa materia a O.I.P.R. (²) El señor Vila estaba en trámites para comprar la cantera Vega Baja, empresa en la que él trabajaba como administrador de obra, para suplir las necesidades de O.I.P.R. Para comprar esta cantera Vila solicitó el 31 de octubre de 1974 un préstamo de trescientos mil dólares ($300,000) al Banco Popular de Puerto Rico. Este préstamo le fue negado el 14 de noviembre de 1974. Debido a la negativa del Banco Popular, el señor Sommerville trató de ayudar personalmente al señor Vila a conseguir el préstamo indicado con directores del Banco Popular, del Chase Man-

---

(¹) El Sr. Raúl Vila, Presidente de Vila & Hnos., su esposa y la sociedad de gananciales compuesta por ellos también figuraron como demandantes. En la sentencia recurrida el tribunal de instancia desestimó sus reclamaciones. El Sr. Henry Radecki, Gerente de Planificación Estratégica y Análisis Financiero de O.I.I., fue incluido como demandado. El tribunal dispuso igualmente de las reclamaciones en contra de éste. O.I.P.R. presentó una reconvención contra los demandantes. Esta alegación también fue desestimada.

(²) El señor Vila no habla inglés y el señor Sommerville, gerente general de O.I.P.R., no habla español. En las negociaciones se usó como intérpretes al Sr. Emilio González, al hijo del señor Vila o al señor Poggi, contador de Vila & Hnos.

hattan Bank y del Banco de Fomento Industrial. Estas diligencias también resultaron infructuosas.

Según concluyó el tribunal, el 11 de noviembre de 1974 los señores Vila y Sommerville en representación de Vila & Hnos. y O.I.P.R., respectivamente, firmaron dos contratos de suministros, uno de arena sílica y otro de piedra caliza. (³) Estos contratos se presentaron a los bancos para acreditar la viabilidad del negocio del señor Vila. (⁴)

---

(³) En el contrato de suministro de arena las partes pactaron:

"1. *Seller* [*Vila & Hnos.*] *shall forthwith proceed with the construction of a plant to process sand* which will meet Buyer's [O.I.P.R.] specifications as set forth. . . . Said plant shall be of a capacity sufficient to meet Buyer's maximum sand requirements . . . which . . . shall not exceed 50,000 tons per year.

"2. .    •    •    •    •    •    •    •

        a. *Price*—$10.00 per ton . . . ."

(Énfasis suplido.)

En el contrato de suministro de piedra caliza las partes pactaron:

"1. *Seller represents that it has a plant to process limestone* which will meet Buyer's specifications. . . . Said plant is of capacity sufficient to meet Buyer's maximum limestone requirements . . . which . . . shall not exceed 20,000 tons per year.

"2. .    •    •    •    •    •    •    •

        a. *Price*—$11.00 per ton . . . ."

(Énfasis suplido.)

El tribunal concluyó que los representantes de O.I.P.R. sabían en todo momento que Vila no tenía cantera propia y que por eso tenía que adquirir cantera Vega Baja o la finca Ayala. Sobre esa determinación existe controversia entre las partes. O.I.P.R. alega que sabía que Vila no tenía planta de procesar arena, pero que Vila aparentó ser dueño o condueño de esa cantera. Explican los demandados que esa es la razón de la diferencia en la redacción de la cláusula núm. 2 de ambos contratos.

(⁴) El tribunal determinó que estos contratos se firmaron el 11 de noviembre de 1974. El señor Vila testificó sobre la veracidad de ese hecho y también se presentó copia de los contratos de donde surge esa fecha. Las partes estipularon la admisión en evidencia de los mismos contratos según fueron presentados al Banco Popular. Éstos, sin embargo, sólo están firmados por el señor Sommerville de O.I.P.R. y no tienen fecha ni la firma del señor Vila. Vista de 2 de junio de 1981, transcripción de la prueba, pág. 71. La solicitud del préstamo al Banco Popular es del 31 de octubre de 1974 y el rechazo de esa solicitud fue el 14 de noviembre de 1974. Esta diferencia es importante para el testimonio de los demandados a los fines de establecer que la firma de los contratos fue para ayudar a Vila a conseguir el financiamiento necesario para la compra de la cantera Vega Baja.

En vista del rechazo de las solicitudes de préstamo relacionadas con la compra de la cantera Vega Baja, el señor Vila le propuso a O.I.P.R. que él compraría una finca —la finca Ayala— que tuviera la materia prima necesaria. Con ese propósito Vila obtuvo un contrato de promesa de compraventa el 28 de noviembre de 1974. Esta finca le costaría a Vila & Hnos. cuatrocientos diez mil dólares ($410,000) de los cuales tendría que pagar cincuenta y dos mil dólares ($52,000) antes de celebrarse la compraventa. El señor Vila pagó dos mil dólares ($2,000) al firmar el contrato de promesa de compraventa y aplazó en tres términos adicionales el pago de los restantes cincuenta mil dólares ($50,000). En diciembre de 1974 vencía el primer pago de diez mil dólares ($10,000). Como Vila no podía cumplir con el pago, el señor Sommerville le pidió que solicitase una prórroga.

El personal técnico de O.I.P.R. llevó a cabo pruebas científicas en los terrenos de la finca Ayala y en los de la cantera Vega Baja; en ambos casos los resultados de las muestras fueron satisfactorios para los demandados.

El 11 de enero de 1974 los señores Sommerville y Henry Radecki, Gerente de Planificación Estratégica y Análisis Financiero de O.I.I., visitaron la residencia del señor Vila. En esa ocasión visitaron la finca Ayala. Radecki examinó un presupuesto preparado por el contador de Vila & Hnos.; ese presupuesto incluía lo que le costaría la operación al señor Vila, incluyendo el costo de la finca Ayala, la maquinaria para montar las distintas plantas y demás gastos de producción. Según ese presupuesto, el costo de la operación sería un millón cuatrocientos setenta y siete mil cien dólares ($1,477,100) y la ganancia anual de Vila & Hnos. sería de cuatrocientos treinta y tres mil dólares ($433,000). Radecki, luego de examinar el documento, "le dio la mano a Raúl Vila y le dijo que el negocio estaba hecho, que [O.I.I.] habría de financiar su proyecto y que a su regreso a Toledo, Ohio, le enviaría un cheque por $20,000 para cubrir los dos plazos vencidos de la

opción del contrato de Ayala. Ya Sommerville había expresado al hijo de Raúl Vila que Owens habría de financiar la operación". Sentencia del tribunal de instancia, determinación de hecho núm. 9, págs. 6–7. (5)

El 23 de enero de 1975 el señor Sommerville se comunicó por teléfono con el hijo del señor Vila para informarle que no realizaría negocios con Vila & Hnos. El 27 de mayo de 1975 Sommerville le envió una carta a Vila en la cual ratificó la decisión anterior y dio como razón para ello que Vila había representado tener una planta sin que la tuviera. (6)

Debido a este incumplimiento el tribunal condenó a los demandados a pagarle a Vila & Hnos. un millón seiscientos veintinueve mil treinta y siete dólares ($1,629,037), (7) los

---

(5) La única prueba presentada para establecer el contrato de financiamiento es el testimonio del señor Vila, el de su hijo y el del señor Poggi, quienes fungieron de intérpretes al señor Vila en esa conversación. Ese acuerdo no se llevó a documento alguno. El tribunal no hizo determinaciones de los detalles de las condiciones y términos del contrato verbal de financiamiento. Infirió que el principal era de un millón cuatrocientos setenta y siete mil cien dólares ($1,477,100), a base del presupuesto preparado por el contador del señor Vila, que debería pagarse en cinco años porque ese era el término de los contratos de suministro y aplicó la tasa de interés prevaleciente en el mercado.

(6) En la carta de 27 de mayo Sommerville expresó:

"Our agreement of November 13, 1974 to buy limestone from you is no longer in effect, since in the agreement the Seller represents that it has a plant to process limestone to meet the Buyer's specifications and requirements. Such a plant does not exist.

"Our other agreement of November 13 to buy sand from you is also no longer in effect. Seller agreed to construct a plant to process sand to Buyer's specifications and requirements. No such plant has been constructed, and as we know there is no possibility of one being constructed in the near future."

(7) Estos daños coresponden a un millón noventa y tres mil cuatrocientos ochenta y siete dólares ($1,093,487) por ganancias dejadas de percibir del contrato de cinco años con O.I.P.R. y de negocios que hubiera podido realizar Vila & Hnos. con otros constructores, y quinientos treinta y tres mil quinientos cincuenta dólares ($533,550) por concepto de la depreciación del equipo que hubiera adquirido Vila para su planta. Se concedieron los dos mil dólares ($2,000) pagados como parte del precio del contrato de la finca Ayala.

intereses legales sobre dicha suma desde que surgió la causa de acción, más cuarenta mil dólares ($40,000) de honorarios de abogados, y las costas correspondientes.

De esta sentencia acuden los demandados y apuntan siete errores que se pueden resumir así: 1) concluir que se celebró un contrato de financiamiento, determinación en contra de lo dispuesto en el Código de Comercio y en contra de la prueba desfilada; 2) determinar que las partes celebraron dos contratos de suministro a pesar de que no hubo consentimiento válido, y de haberlo, que los mismos estaban sujetos a una condición suspensiva; 3) dar credibilidad a la prueba de los demandantes; 4) imponer el pago de intereses legales desde que surgió la causa de acción; 5) imponer cuarenta mil dólares ($40,000) de honorarios de abogados. El 2 de junio de 1983 expedimos el recurso de revisión.

## II

Antes de entrar a considerar las controversias de este recurso debemos dejar claro que en este caso son de aplicación las normas de derecho mercantil. Los contratos en controversia son de carácter mercantil. La doctrina favorece la posición de que el contrato de suministro, como norma general, tiene un carácter especial de mercantil. M. Del Arco Torres y M. Pons González, *Diccionario de Derecho Civil*, Pamplona, Ed. Aranzadi, 1984, T. I., pág. 343; E. Langle

---

El tribunal hizo los estimados de ganancias del contrato con O.I.P.R. a base de un consumo máximo de 50,000 toneladas de arena y 20,000 toneladas de piedra. Esa determinación se hizo a pesar de que ambos contratos de suministro expresan: "Buyer does not represent that it will have any *minimum* requirements for limestone [or sand] during the term of this agreement." (Énfasis nuestro.) Para llegar al resultado indicado el tribunal concluyó que ambos contratos eran de adhesión debido a que fueron redactados por O.I.P.R. y a que no hubo bilateralidad contractual en las negociaciones. Esta determinación se hizo a pesar del testimonio de Vila a los fines de que fue él quien estableció el precio de los contratos de suministro. ("En esos contratos fueron puestos [*sic*] los precios que di yo.") Vista del 21 de enero de 1981, transcripción de la prueba, pág. 100.

Rubio, *Manual de Derecho Mercantil Español*, Barcelona, Ed. Bosch, 1959, T. III, págs. 203–204. [8] En este caso, donde las cosas a ser vendidas —arena y piedra— son destinadas como materia prima para la industria del cristal, no debe existir duda de que estamos ante un contrato mercantil.

■ En cuanto al alegado contrato de financiamiento, éste también tiene el mismo carácter. Aquí Vila & Hnos., [9] O.I.P.R. y O.I.I. son comerciantes; el dinero que le hubieran prestado los demandados al demandante estaba destinado para actos de comercio. Art. 229 (10 L.P.R.A. sec. 1651). [10] Véase *Pescadería Rosas, Inc.* v. *Lozada*, 116 D.P.R. 474 (1985). Por lo tanto, el cuerpo de derecho que aplica a este caso es el mercantil.

## III

■ La contratación mercantil al igual que la civil permite libertad de forma. Véanse los Arts. 81, 82 y 83 del Código de Comercio, 10 L.P.R.A. secs. 1301–1303; J. Garrigues,

---

[8] E. Langle Rubio, *Manual de Derecho Mercantil Español*, Barcelona, Ed. Bosch, 1959, T. III, págs. 203–204, expresa sobre esto:

"El T. S. declaró que 'la compra de suministros tiene un carácter especial de [mercantil]' y debe ajustarse a los preceptos del [Código de Comercio] (Sent. 26 sept. 1927). Novoa considera 'notoriamente erróneo' que se considere [mercantil] *siempre*. La verdad es que no puede rechazarse de manera absoluta la posibilidad de que el contrato sea civil en algún caso (cuando entren en relación directa el productor y el consumidor), pero casi siempre será fruto de una actividad [mercantil] o industrial." (Énfasis en el original.)

[9] Vila & Hnos. se dedicaba a la transportación de materiales para construcción; entre éstos transportaba arena y piedra. Su negocio con O.I.P.R. requería de ese servicio, y como fase nueva en sus negocios la explotación de la finca Ayala. Sobre el carácter de comerciante de Vila & Hnos., como porteador, véase el Art. 267 (10 L.P.R.A. sec. 1771).

[10] Si todavía existiera duda sobre el carácter mercantil del alegado acuerdo de financiamiento, conforme la doctrina de *Buena Vista Dairy, Inc.* v. *Aponte*, 108 D.P.R. 657, 660 (1979), se llegaría al mismo resultado, pues ese acuerdo sería un negocio accesorio entre las partes, necesario para la celebración de los contratos de suministro.

*Curso de Derecho Mercantil*, 8va ed., Madrid, Imprenta Aguirre, 1983, T. II, págs. 20–27; R. Uría, *Derecho Mercantil*, 12ma ed., Madrid, Imprenta Aguirre, 1982, págs. 474–477; J. M. Martínez Val, *Derecho Mercantil*, Barcelona, Ed. Bosch, 1979, pág. 445; Langle Rubio, *op. cit.*, págs. 74–77; R. Gay de Montellá, *Código de Comercio Español*, Barcelona, Ed. Bosch, 1936, T. I, pág. 240. El Art. 82 expresamente consagra ese principio y el Art. 83 dispone las excepciones a esa norma general. Sin embargo, el Art. 82 tiene una limitación de carácter probatorio que afecta el principio de libertad de forma. Véanse *Loíza Sugar Company* v. *Baquero & Cía.*, 29 D.P.R. 863, 866 (1921); Garrigues, *op. cit.*, pág. 21.[11] Este artículo dispone en parte:

. . . la declaración de testigos no será por sí sola bastante para probar la existencia de un contrato, cuya cuantía exceda de trescientos dólares, a no concurrir con alguna otra prueba.[12]

Este artículo se basa en la desconfianza del legislador con la prueba testifical en este tipo de asunto, la contratación mercantil. Garrigues, *op. cit.*, pág. 25; Gay de Montellá, *op. cit.*, pág. 246. Este artículo también trata de fomentar la seguridad en el tráfico comercial mediante la coacción hacia la

---

[11] J. Garrigues, *Curso de Derecho Mercantil*, 8va ed., Madrid, Imprenta Aguirre, 1983, T. II, pág. 21, lo explica de la siguiente forma: "Normas de prueba y normas de forma son, pues, distintas. Lo que ocurre es que las normas materiales sobre la prueba implican una coacción hacia la forma. Ejemplo: si dos personas reconocen que entre ellas existe un contrato verbal de venta de mercaderías por valor de 50,000 pesetas, ninguna puede excusarse de cumplirlo alegando la falta de forma. Pero si una de ellas niega la existencia del contrato, la otra no puede valerse de la prueba de testigos (v. sec. 2.°, art. 51) [equivalente a nuestro Art. 82], que sería la más adecuada para probarlo. Esa norma de prueba estimula, pues, a dar forma escrita a este contrato."

[12] En *A. Gelabert & Cía.* v. *Hernández*, 31 D.P.R. 834, 839 (1923), resolvimos que la Ley de Evidencia no había derogado este artículo; tampoco es así bajo las Reglas de Evidencia de 1979. Véase la Regla 84(A) (Derogaciones y vigencia provisional), 32 L.P.R.A. Ap. IV, y el Art. 5 del Código Civil.

forma. Al rechazar el criterio del legislador, algunos autores sostienen que la referencia a 1,500 pesetas en el Art. 51 del Código español es anacrónica y constituye una limitación muy onerosa al principio de libertad probatoria. Uría, *op. cit.*, pág. 476; Gay de Montellá, ibíd; Garrigues, *op. cit.*

En este recurso la parte demandante trató de probar la existencia del contrato a base del testimonio del señor Vila, su hijo y el contador de Vila & Hnos. El tribunal de instancia reconoció que se trataba de "un contrato verbal entre Vila y Owens". Determinación de derecho núm. 8 de la sentencia recurrida, pág. 14. En los autos del caso no hay ninguna otra forma de prueba, véase la Regla 3 de Evidencia, 32 L.P.R.A. Ap. IV, distinta a la testifical que demuestre la existencia del contrato de financiamiento. Los contratos de suministro y el presupuesto de operación para la finca Ayala no son prueba del acuerdo de financiamiento; los contratos indicados prueban que Vila & Hnos. pactó con O.I.P.R. suministrarle piedra caliza y arena sílica a determinado precio y con ciertas condiciones; el otro documento es prueba de las proyecciones de costo y ganancia de Vila si establecía la cantera en la finca Ayala. El hecho de que funcionarios de O.I.P.R. y O.I.I. examinaran ese documento no constituye prueba suficiente para inferir una oferta completa y su respectiva aceptación por O.I.P.R. o por O.I.I. [13] "Sin una oferta completa

---

[13] Los detalles de este financiamiento son completamente imprecisos. El señor Vila declaró de la siguiente forma:

"P. Señor Vila, en alguna ocasión durante todas estas conversaciones y negociaciones que usted tuvo con Owens, ¿se llegaron a discutir por ellos con usted los detalles del financiamiento que le había de dar Owens a usted?

"R. No, dijeron que eso no me preocupara, que iban a hacer el financiamiento adecuado." Vista de 26 de enero de 1981, transcripción de la prueba, págs. 19–20.

En la vista del 5 de marzo de 1981 el señor Vila contestó de la siguiente forma:

"P. ¿Por cuánto tiempo era ese préstamo?

no podía haber una aceptación definitiva que perfeccionara el contrato." *Prods. Tommy Muñiz* v. *COPAN*, 113 D.P.R.

"R. ¿ El de la Owens Illinois?
"P. Esa oferta de ayuda económica.
"R. No sé; sería por los cinco años . . . era el contrato . . . ." Transferencia de la prueba, pág. 47.

Y en la vista del 5 de marzo el señor Vila contestó de la siguiente forma:

"P. ¿ Cómo se iba a hacer?
"R. Cómo que cómo lo iba a hacer, ellos iban a garantizar la operación. ¡A mí que más me daba que me entregaran el dinero para pagar a Kane, que me entregaran la maquinaria que ellos pagaban a veinte años en otro lado! ¡A mí me era igual! A mí lo que me interesaba era la planta física, no me importaba que me entregaran el dinero de una manera que de otra, igual que la finca, eso es todo. Eso nunca se habló, esos detalles que iban a entregar el millón uno arriba del otro ahí para que yo agarrara ésto y ésto, ellos iban a garantizar la operación." Transcripción de la prueba, pág. 114.

Si le otorgáramos entera credibilidad a los testigos de la parte demandante, lo que sí podría inferirse es que O.I.I. le prometió enviar $20,000 a Vila. El 21 de enero el hijo del señor Vila declaró:

"R. . . . Y enseguida, en esos momentos que el señor Radecki pidió esos balances, le dio la mano a mi padre y él dijo que todo estaba bien, que la Owens Illinois iba a hacer operaciones y que contáramos con el apoyo y el financiamiento de ellos; que iban a traer unos $20,000 en primera instancia, el primer dinero que traerían, y nada más. Ahí se despidió amablemente, y se fue con el señor James Sommerville, el señor Radecki." Transcripción de la prueba, pág. 59.

Y luego el señor Raúl Vila, hijo, ratificó su testimonio anterior de la siguiente forma:

"P. ¿ Usted tiene conocimiento de la ayuda . . . ? Usted alega que el señor Radecki ofreció una ayuda económica, ¿ usted tiene conocimiento de qué ayuda fue la que ofreció?
"R. La que yo oí, o sea, en la que yo actué como intérprete, una ayuda económica de $20,000 para el pago.
"P. O sea, el pronto de la finca.
"R. Correcto." Tanscripción de la prueba, pág. 69.

Aunque aceptáramos que existió esa promesa de enviar los $20,000 el señor Vila todavía hubiera necesitado $30,000 para terminar de pagar el acuerdo de promesa de compraventa de la finca Ayala y más de $1,400,000 para adquirir la finca y la maquinaria necesaria. Si tomamos en consideración que dos meses antes tres bancos distintos le negaron al señor Vila financiamiento de $300,000 resulta completamente improbable que el señor Vila hubiera podido montar su cantera y honrar los contratos de suministro.

517, 524 (1982). Es forzoso concluir que Vila & Hnos. no probó la existencia del contrato de financiamiento de $1,477,100. Ese financiamiento era indispensable para que Vila & Hnos. comprara la finca Ayala y la maquinaria necesaria para montar su cantera y la planta de procesar arena; sin esa finca y maquinaria Vila no hubiera podido honrar los contratos de suministro que firmó con O.I.P.R.[14] En consecuencia, las causas de acción por incumplimiento de contrato y daños de los recurridos no están apoyadas por la prueba y la condena de daños no puede prevalecer. Debido al resultado a que llegamos no tenemos que expresarnos sobre los demás señalamientos de error.[15]

*Se dictará sentencia en la cual se revoca la del Tribunal Superior, Sala de Bayamón, de 27 de junio de 1983.*

---

[14] Langle Rubio, *op. cit.*, pág. 204, expresa cuándo un contrato de suministro se puede dar por terminado:

"Cuando las prestaciones son consecutivas y autónomas, el incumplimiento de alguna de ellas no afecta, en principio, a las restantes: constituye una mora *parcial*, insuficiente para justificar la resolución *total* del contrato; a menos que tal incumplimiento produzca una verdadera inseguridad para el futuro o revista suma gravedad (v. gr. falta de aprovisionamiento de materias primas a una fábrica, que la deje paralizada). Siendo leve, se dará preaviso de rescindir el contrato si se incurre en repetición." (Énfasis en el original.)

[15] Las determinaciones de hecho en este caso no son suficientes para configurar la acción en daños y perjuicios por culpa *in contrahendo* conforme lo establecido en *Prods. Tommy Muñiz* v. *COPAN*, 113 D.P.R. 517 (1982); no se probó que la conducta de los demandados fuera culposa, dolosa o fraudulenta, y tampoco se establecieron satisfactoriamente los criterios señalados en *Prods. Tommy Muñiz* v. *COPAN*, supra, págs. 529 y 530. La conducta de los demandantes no ayuda a dicha parte a establecer su reclamación. Vila & Hnos. representó tener una planta para procesar piedra y otra de arena cuando en realidad no las tenía y tampoco tenía la capacidad económica o de crédito necesario para poder cumplir los contratos de suministros. Además, aunque el rompimiento de las negociaciones se produjo en una etapa relativamente avanzada, los demandantes no habían invertido prácticamente nada en el negocio, apenas dos mil dólares en un negocio millonario. *Prods. Tommy Muñiz* v. *COPAN*, ibíd, criterios tres y cuatro.

El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión escrita.