# 2007 DTA 115

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE CAROLINA**
**PANEL XII**

JESÚS SANTANA LEDUC, SU ESPOSA JOSEFINA RIVERA VILLALOBOS
Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR ELLOS
Apelados

v.

MARGARITA CALO ÁLVAREZ, WILLIAM CALO ARROYO, SU ESPOSA MYRIAM ÁLVAREZ BETANCOURT Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR ELLOS
Apelantes

Núm. KLAN-06-01612

San Juan, Puerto Rico, a 24 de septiembre de 2007

Panel integrado por su Presidente, el Juez Ortiz Carrión,
el Juez Brau Ramírez y la Juez Fraticelli Torres

Brau Ramírez, Juez Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

**I**

Se trata de una demanda en cobro de dinero originalmente presentada por los esposos apelados Jesús Santana Leduc y Josefina Rivera Villalobos ante el Tribunal de Primera Instancia, Sala de Carolina, contra la apelante Margarita Calo Álvarez y los padres de ésta, los también apelantes William Calo Arroyo y Myriam Álvarez Betancourt.

La demanda está relacionada con un contrato celebrado entre las partes en diciembre de 1995. Para esa fecha, los apelados eran los operadores de dos estaciones de gasolina ubicadas en el Municipio de Carolina,

bajo contrato con la Caribbean Petroleum Corporation. Una de las estaciones estaba situada en la Avenida Fragoso en la Urbanización Villa Fontana y la otra en la Calle Heriberto Nieves de la Urbanización Los Ángeles.

El 8 de diciembre de 1995, mediante un contrato de compraventa, los apelados acordaron vender sus negocios a la apelante Margarita Calo Álvarez, por la cantidad de $700,000.00. Los esposos Calo Álvarez comparecieron como garantizadores solidarios de la transacción.

La parte apelante pagó a los apelados $400,000.00. Para garantizar el balance del precio, ascendente a $300,000.00, los padres de la Srta. Calo Álvarez suscribieron un pagaré por esa cantidad a favor de los apelados. Los padres de la Srta. Calo Álvarez otorgaron una segunda hipoteca sobre dos apartamentos propiedad de ellos, uno ubicado en el Condominio Playa Esmeralda en Isla Verde y otro en el Condominio La Mancha.

La cláusula 13 del contrato disponía que:

*"Las partes acuerdan que las hipotecas que en esta misma fecha habrán de constituir los garantizadores solidarios, será el límite de su responsabilidad hacia los [apelados], herederos, sucesores o cesionarios, entendiéndose que de haber incumplimiento por parte de la [apelante Calo Álvarez], los [apelados], sus herederos, sucesores o cesionarios podrán cobrar su acreencia únicamente ejecutando las referidas hipotecas.*

*La hipoteca fue constituida mediante la Escritura Número 27 otorgada por las partes en esa misma fecha, 8 de diciembre de 1995, ante el Notario Jorge Bermúdez Torregrosa. Los apelantes se comprometieron a pagar una penalidad de 10% del balance adeudado en caso de reclamación judicial.*

*Al igual que el contrato de compraventa, la Escritura de Hipoteca aclaraba que las hipotecas sobre los inmuebles constituirían "el límite de la responsabilidad de los [apelantes] ante los [apelados], sus herederos, sucesores o cesionarios, entendiéndose que de haber incumplimiento por parte de la Compradora, los [apelados], sus herederos, sucesores o cesionarios podrán cobrar su acreencia únicamente ejecutando las referidas hipotecas".*

La Srta. Calo Álvarez comenzó a operar las estaciones de gasolina. La apelante no pagó a los apelados el balance del precio de venta. Los apelados reclamaron a los esposos Calo Álvarez el pago de la obligación.

Luego de varias negociaciones, el 3 de febrero de 1997, las partes suscribieron un Acuerdo Privado de Transacción que fue juramentado por ellos ante el Notario Público Rolando Silva. Conforme a este acuerdo, los esposos Calo Álvarez vendieron a un tercero su apartamento en el Condominio La Mancha y entregaron a los apelados el precio de venta, luego de descontados los gastos de la transacción y el balance de la primera hipoteca que gravaba la propiedad. Los esposos Calo Álvarez también dieron a los apelados su apartamento en el Condominio Playa Esmeralda, en pago de su obligación. Los apelados acordaron asumir la primera hipoteca que afectaba la propiedad.

Existe controversia entre las partes en torno a si al momento de otorgar el contrato de compraventa y la escritura de hipoteca en diciembre de 1995 y de suscribir el acuerdo de transacción en febrero de 1997, el apelado Jesús Santana Leduc gozaba de capacidad para entender la transacción.

El récord refleja que antes y durante el período correspondiente a estas transacciones, el apelado sufrió serios percances de salud, que fueron los que le motivaron a vender su negocio a la parte apelante.

El apelado sufrió un ataque cardíaco en 1987, cuando tenía 53 años de edad. El apelado se recuperó de esta

condición y continuó trabajando.

El 7 de mayo de 1993, el apelado sufrió un primer derrame cerebral. El apelado se recuperó parcialmente de esta condición, pero no pudo regresar a trabajar. Se le diagnosticó enfermedad cerebrovascular.

El 22 de junio de 1993, el apelado sufrió un segundo derrame. El apelado también desarrolló una embolia pulmonar. Fue hospitalizado debido a estas condiciones. Un examen de resonancia magnética ("*M.R.I.*") del cerebro del apelado realizado en el Hospital Oncológico del Centro Médico el 24 de junio de 1993, reflejó que para esa fecha el apelado tenía señales de atrofia cerebral y de enfermedad vascular extensa y difusa.

Eventualmente, la Administración del Seguro Social de los Estados Unidos declaró al apelado incapacitado. No surge, sin embargo, que se le hubiera incapacitado judicialmente.

Para septiembre de 1995, en el contexto de una deposición a la que se proponía someter al apelado, su cardiólogo, el Dr. Luis Román Irizarry, emitió una certificación de que el apelado sufría de enfermedad coronaria y debía evitar situaciones de estrés físico y mental. Para esta fecha, la neuróloga del apelado, Dra. Marina Rivera, emitió una certificación parecida a los efectos de que el apelado no debía someterse a ninguna presión.

Como consecuencia de su condición, la parte apelada decidió vender su negocio. A estos fines, en o cerca de noviembre de 1995, la parte apelada entró en negociaciones con los apelantes, las que culminaron en el negocio mencionado del 8 de diciembre de 1995.

La parte apelada era consciente de la condición de salud del apelado. Éste siempre acudía a las reuniones acompañado de su esposa, la apelada Josefina Rivera Villalobos. Eventualmente, los apelados designaron al Sr. José Deynes Torres para que los representara en las negociaciones con los apelantes.

El 28 de noviembre de 1995, la Dra. Rivera emitió una certificación en inglés en la que expresaba que:

*"This is to certify that Jesús Santana Leduc is a 60 [year old] male with history of Eosinophilia, myocardial infarction, stroke x 2 times, chronic dizziness, most probably due to to Polycitemia. Patient is disable[d] due to all of [the] above but has **no** intellectual disability and can handle his financial decisions and also is able to endorse and charge checks + papers."* (Subrayado original)

A base de esta certificación, las partes suscribieron el negocio de compraventa y la hipoteca. La esposa del apelado no expresó reparos al negocio. Tampoco lo hizo el Sr. Deynes Torres.

En enero de 2000, los apelados instaron la presente acción en cobro de dinero contra los apelantes ante la Sala de Carolina del Tribunal de Primera Instancia. En su demanda, los apelados alegaron que los apelantes aún les adeudaban $204,473.00 por la venta de las estaciones.

En su demanda, los apelados reconocieron que suscribieron una transacción con los apelantes el 3 de febrero de 1997, pero alegaron que este documento *"es nulo por ausencia de causa y por ausencia de consentimiento válido además de que los demandados indujeron a los demandantes a firmar dicho documento con representaciones falsas y maquinaciones insidiosas, entre otras, haciéndoles creer a los demandantes que éstos no podrían cobrar la totalidad de su acreencia por la alegada insolvencia de dichos demandados y porque supuestamente la obligación de pago de éstos estaba limitada a la garantía hipotecaria ..."*.

Los apelados le solicitaron al Tribunal que condenara a los apelantes a pagarles la suma adeudada más el 10% o $20,473.00, según lo acordado en la escritura de hipoteca, por concepto de costas, gastos y honorarios de

abogado.

A pesar de que las alegaciones indicaban que el apelado Jesús Santana Leduc carecía de capacidad, éste compareció por sí mismo al litigio, no a través de un tutor. No surge que la parte apelada solicitara la designación de un defensor judicial.

Los apelantes contestaron la demanda y negaron las alegaciones. Oportunamente, el caso fue transferido a la Sala de Río Grande, debido a que el Juez que presidía la controversia fue trasladado.

El 28 de septiembre de 2001, mientras el caso estaba pendiente, el apelado sufrió un tercer derrame cerebral. Poco después, el 29 de octubre de 2001, el apelado sufrió un cuarto derrame cerebral, el que estuvo acompañado por una angina de pecho.

Estando en controversia su capacidad, el apelado fue sometido a exámenes por peritos designados por ambas partes, Dr. Víctor Mojica Morales y Dr. Luis Sánchez Longo, quienes presentaron informes sobre la cuestión.

Luego de otros trámites, el Tribunal celebró la vista en su fondo del caso. Ambas partes presentaron prueba en apoyo de sus respectivas posiciones, incluida la declaración de sus respectivos peritos.

El perito de los apelados declaró que él había examinó la prueba de M.R.I. tomada al apelado en junio de 1993, varios meses antes del otorgamiento del contrato de compraventa, y la comparó con una prueba similar tomada en octubre de 2001. Según el perito de los apelados, los hallazgos cerebrales del apelado en la prueba de 2001 no eran sustancialmente distintos al M.R.I. tomado en junio de 1993. Según este perito, las pruebas reflejaban que existía evidencia de atrofia cerebral y de enfermedad vascular extensa y difusa.

Por su parte, el perito de los apelantes declaró que él entendía que el apelado tenía la capacidad para formular un juicio de negocios y para entender las transacciones en las que había participado.

Ambos peritos hicieron preguntas al apelado para tratar de establecer su capacidad para formular juicios abstractos.

Luego de otros trámites, el 16 de junio de 2006, el Tribunal de Primera Instancia emitió la sentencia apelada y declaró con lugar la demanda.

En su sentencia, el Tribunal de Primera Instancia confirió peso a la opinión del perito de los apelados, quien declaró que el apelado estaba incapacitado para entender los negocios.

En su sentencia, el Tribunal explicó:

*"La capacidad del [apelado] para manejar pensamientos abstractos es, sin duda, el elemento esencial e indispensable para entender la naturaleza y el alcance del negocio jurídico y la transacción financiera que se llevó a cabo el 8 de diciembre de 1995. Este criterio fue objeto de amplia discusión e interrogatorio de los peritos médicos durante las audiencias evidenciarias celebradas. El Dr. Luis P. Sánchez Longo opinó que el [apelado] tenía suficiente "juicio decisional" y la capacidad para formular y entender pensamientos abstractos, ya que, según el galeno, "[e]stas pruebas indican que tiene dificultad en manejar pensamientos abstractos, pero con una ayuda logra la respuesta." ...*

*El Dr. Víctor M. Mojica Morales, por el contrario, describió en detalle las diferentes actividades del diario vivir ... que se evalúan en el campo de la neurología para determinar el grado de incapacidad de un paciente*

*con demencia para funcionar independientemente y poder llevarlas a cabo. El Dr. Víctor M. Mojica Morales opinó en su informe que el juicio del [apelado] "... está afectado y el razonamiento era concreto, sin abstracción."... Durante su testimonio en el examen directo ... el Dr. Víctor M. Mojica Morales amplió su opinión señalando que a la luz de la complejidad de la transacción financiera en cuestión, particularmente la cláusula inusual de pacto de concreción de hipoteca, el [apelado] no tenía, en su opinión, suficiente "juicio financiero" para entender la naturaleza o el alcance de dicha contratación...".*

El Tribunal entendió que, al requerir asistencia para completar los juicios abstractos, el apelado carecía de là capacidad suficiente para entender la transacción.

El Tribunal expresó:

*"Al examinar las preguntas específicas formuladas al [apelado] por el Dr. Luis P. Sánchez Longo en torno a la transacción realizada en el 1995, y aquellas otras preguntas de "frases populares" dirigidas a solicitar la formulación de pensamiento abstracto del [apelado], el Tribunal tiene cierta inquietud ante la aparente sencillez [e] ingenuidad de dichas preguntas, particularmente ante el contexto de la cuestión medular que nos concierne en autos. ...*

*El Tribunal tiene dificultad en inferir de las contestaciones parcas del [apelado] a dichas preguntas sobre "frases populares", logradas sólo con la ayuda y sugerencias del Dr. Luis P. Sánchez Longo, si en realidad el [apelado] puede formular pensamientos abstractos por sí sólo. Tampoco disiparon nuestras dudas si realmente tenía o no su juicio afectado el 8 de diciembre de 1995 como para entender la naturaleza y el alcance de la transacción que nos concierne en [el caso de] autos.*

*Sin entrar en materia técnica de neurología, o decidir si las preguntas formuladas al [apelado] por el Dr. Luis P. Sánchez Longo, o las contestaciones sugeridas eran o no adecuadas, lo cual amerita nuestra deferencia al testimonio de ambos peritos médicos, el Tribunal, sin embargo, no puede ignorar el hecho de que el Dr. Luis P. Sánchez Longo acepta claramente que el [apelado] tiene dificultad en manejar **por sí sólo** pensamientos abstractos, lo cual nos parece inconsistente para propósitos de nuestra decisión en autos, con su otra conclusión de que el [apelado] tiene buen "juicio decisional".*

*...*

*Coincidimos con la opinión pericial y conclusión del Dr. Víctor M. Mojica Morales que la demencia vascular presentada por el [apelado] "le incapacita y lo hace incompetente mentalmente e incapaz para tomar decisiones y manejar sus finanzas y negocios en su mejor interés y beneficio", y que "... cualquier decisión tomada, negocio, venta o compra realizada por el [apelado] después de 1993 no estaba avalada por un buen juicio y razonamiento que pudiera redundar en su mejor interés y beneficio".*

El Tribunal concluyó que el pacto de concreción acordado por las partes *"representa una desviación significativa de la forma usual de efectuar este tipo de transacción de compraventa, tanto en sus aspectos financieros como en sus aspectos jurídicos. Consideramos que la contratación en autos implicó unas consecuencias distintas, más complejas para entender y mucho más restrictivas en su alcance, a las que normalmente han de seguirse por parte de un vendedor prudente y razonable en el caso de incumplimiento con el pago del precio aplazado"*. El Tribunal entendió que el hecho de que el apelado *"pueda haber estado asistido por abogado o por su propia esposa al momento de efectuar la contratación, no cambia nuestra conclusión"*.

El Tribunal también concluyó que los apelantes actuaron dolosamente. Expresó:

*"De los hechos anteriormente expuestos, el Tribunal puede inferir que el [apelante] estaba consciente de*

*los problemas para entender y de la incapacidad mental del [apelado] para consentir a la contratación que se venía negociando. Ante ese cuadro de desventaja y posible abuso de confianza, nos resulta más fácil entender cómo el [apelado] y su esposa pudieron acceder a unas garantías limitadas e insuficientes por parte del [apelante] para responder por la obligación contraída por su hija, la compradora codemandada . . . y por ellos como supuestos garantizadores solidarios."*

El Tribunal declaró que el contrato de compraventa y la escritura de hipoteca otorgados el 8 de diciembre de 1995 y la transacción del 3 de febrero de 1997 eran nulos *ab initio*. El Tribunal, sin embargo, ordenó a los apelantes pagar a los apelados el precio impagado de la escritura de hipoteca ascendente a $204,473.19, más intereses.

Los apelantes solicitaron determinaciones adicionales de hechos, solicitud que fue finalmente denegada por el Tribunal de Primera Instancia el 13 de noviembre de 2006.

Insatisfechos, los apelantes acudieron ante este Tribunal.

## II

En su recurso, los apelantes plantean que el Tribunal de Primera Instancia erró al determinar que el apelado estaba incapacitado para entender en los tres negocios suscritos por él y al ordenarles pagar el balance de la deuda, a pesar de haber concluido que las transacciones eran nulas.

En nuestra jurisdicción, según se conoce, la existencia de un contrato requiere la concurrencia de los siguientes elementos: (1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato; (3) causa de la obligación que se establezca. 31 L.P.R.A. sec. 3391; *Garriga Hijo, Inc. v. Cond. Marbella,* 143 D.P. R. 927, 932 esc. 3 (1997); *Quiñones López v. Manzano Posas,* 141 D.P.R. 139, 154 (1996).

En ausencia de cualquiera de estos requisitos, o cuando el contrato resulta contrario a la ley, la moral o el orden público, 31 L.P.R.A. sec. 3372, el negocio es nulo e inexistente y no produce efecto alguno. *De Jesús González v. A.C.,* 148 D.P.R. 255, 263-264 (1999); *Col Int'l Sek P.R., Inc. v. Escribá,* 135 D.P.R. 647, 665 (1994); *Pérez Mercado v. Martínez Rolón,* 130 D.P.R. 134, 150 (1992); *Santiago Marrero v. Tribunal Superior,* 89 D.P.R. 835, 839 (1964).

El requisito del consentimiento, de ordinario, se manifiesta por la aceptación de una oferta sobre la cosa y causa del negocio. 31 L.P.R.A. sec. 3401; *Vilá & Hnos., Inc. v. Owens Ill. de P.R.,* 117 D.P.R. 825, 834-835 (1986); *Prods. Tommy Muñiz v. COPAN,* 113 D.P.R. 517, 521 (1982).

Ahora bien, de acuerdo al Art. 1215 del Código Civil, no pueden prestar su consentimiento los menores no emancipados, los locos o dementes y los sordomudos que no sepan escribir. 31 L.P.R.A. sec. 3402; cf., 31 L.P. R.A. sec. 82 (Supl. 2006) (restricciones a la capacidad de las personas).

· El Tribunal Supremo de Puerto Rico ha aclarado que el *"loco"*, o *"demente"* al que se refiere el precepto no es el considerado desde el punto de vista siquiátrico, sino aquel que no goza de capacidad suficiente para entender la transacción, considerándola en todos sus aspectos. *Laureano Pérez v. Soto,* 141 D.P.R. 77, 91 (1996); *Rivera v. Sucn. Díaz Luzunaris,* 70 D.P.R. 181, 188 (1949).

La demencia clínica de uno de los contratantes por sí sola es insuficiente para adjudicar la legalidad del contrato. Esta condición puede dar base a la inferencia de incapacidad, pero para destruir la validez del negocio tiene que establecerse que la persona carecía de la capacidad para entender la transacción particular. *Rivera v. Sucn. Díaz Luzunaris,* 70 D.P.R. a la pág. 190.

En el contexto de la capacidad para testar, el Tribunal Supremo de Puerto Rico ha señalado que la edad avanzada de la persona, por sí sola, es insuficiente para demostrar su incapacidad mental. *Andino v. Andino,* 83 D.P.R. 138, 139 (1961); *Jiménez v. Jiménez,* 76 D.P.R. 718, 734 (1954). Tampoco la conducta rara o excéntrica que pueda exhibir la persona es suficiente para establecer su incapacidad. *Jiménez v. Jiménez,* 76 D.P.R. a la pág. 724; *Ortiz v. Bermúdez,* 70 D.P.R. 707, 713 (1949).

La capacidad debe existir en el instante que se produce la contratación. *Fuentes v. Federal Land Bank,* 64 D.P.R. 199, 203 (1944); véase, además, *Jiménez v. Jiménez,* 76 D.P.R. a la pág. 732; *Ortiz v. Bermúdez,* 70 D.P.R. a la pág. 712. ■

La validez del contrato y del consentimiento prestado se presumen. *Unisys v. Ramallo Brothers,* 128 D.P.R. 842, 853 (1991). También se presume la capacidad de las partes, en ausencia de una declaración judicial de incapacidad; *Rivera y otros v. Bco. Popular,* 152 D.P.R. 140, 157 (2000); *Jiménez v. Jiménez,* 76 D.P.R. a la pág. 718; véase, además, *Sucesión Cabrera v. Aponte,* 29 D.P.R. 938 (1921) (declarada la incapacidad judicial de una persona, se presume la inexistencia de cualquier contrato celebrado por ésta luego de esta declaración, aunque esta presunción puede refutarse).

Corresponde a la parte que cuestiona la existencia de capacidad de una persona al momento de la celebración de un contrato el peso de la prueba para establecer su incapacidad mediante evidencia clara y convincente. *Torres v. A.F.F.,* 96 D.P.R. 648, 652 (1944); *Jiménez v. Jiménez,* 76 D.P.R. a la pág. 733; *Ortiz v. Bermúdez,* 70 D.P.R. a la pág. 713.

Lo anterior puede hacerse mediante evidencia pericial. Cf., *Jiménez v. Jiménez,* 76 D.P.R. a la pág. 733; véase, además, la Regla 32.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 32.1.

Cuando la prueba presentada es de naturaleza pericial, el tribunal apelativo está en la misma posición que el juzgador de primera instancia para evaluarla y arribar a sus propias conclusiones. *Arrieta v. De la Vega,* 165 D.P.R. ___ (2005), **2005 J.T.S. 134,** a la pág. 169; *Culebra Enterprises Corp. v. E.L.A.,* 143 D.P.R. 935, 952 (1997); *Ramos, Escobales v. García, González,* 134 D.P.R. 969, 976 (1993); *Ríos Ruiz v. Mark,* 119 D.P.R. 816, 820 (1987).

En la situación de autos, según hemos visto, se trata de un contrato de compraventa otorgado por las partes para la compra de dos estaciones de gasolina. La prueba refleja que el apelado se vio obligado a vender sus negocios debido a que se incapacitó físicamente para seguir operándolos. Las estaciones fueron adquiridas por la apelante Calo Álvarez. Los padres de ésta se ofrecieron como garantizadores solidarios del pago del precio de venta, si bien limitaron su responsabilidad a los dos inmuebles que ofrecieron en hipoteca.

Este tipo de pacto está expresamente contemplado por nuestro ordenamiento, el que le reconoce plena eficacia. 30 L.P.R.A. sec. 2603; *P.R. Prod. Credit Assoc. v. Registrador,* 123 D.P.R. 231, 241-242 (1989); *Campos del Toro v. Ame. Transit Corp.,* 113 D.P.R. 337, 342-345 (1982).

En el presente caso, sin embargo, los apelados plantearon que el pacto era nulo debido a que el apelado Jesús Santana Leduc carecía de capacidad para entender el negocio. Hemos examinado los testimonios periciales tomados en consideración por el Tribunal de Primera Instancia para concluir que el apelado carecía de capacidad para contratar y somos de la opinión que las determinaciones del foro recurrido no representan el balance más racional y justiciero de la prueba.

En su sentencia, el Tribunal confirió gran peso a los testimonios de los peritos presentados por las partes. El Tribunal no confirió peso alguno a la certificación suscrita el 28 de noviembre de 1993 por la Dra. Marina Rivera, neuróloga personal del apelado, quien lo atendía para esta época.

La Dra. Rivera expresamente certificó que, aunque estaba físicamente impedido para continuar con sus negocios, el apelado no tenía incapacidad intelectual alguna y que podía manejar sus negocios y endosar y suscribir cheques y documentos (*"has no intellectual disability and can handle his financial decisions and also is able to endorse and charge checks [and] papers"*).

A diferencia de la Dra. Rivera, ninguno de los peritos que declaró en el juicio examinó al apelado en fecha cercana a los contratos otorgados por él. Los peritos que evaluaron al apelado lo examinaron luego de 2001, cuando habían transcurrido más de seis años y después de que el apelado experimentara dos derrames adicionales.

La evidencia pericial más contemporánea a los negocios impugnados lo era la certificación de la Dra. Rivera, la que no fue preparada con miras a un litigio. ■

Debe recordarse que la determinación de la capacidad debe realizarse con miras al momento de la transacción jurídica impugnada y no de la posterior condición de la persona. *Jiménez v. Jiménez*, 76 D.P.R. a la pág. 732; *Fuentes v. Federal Land Bank*, 64 D.P.R. a la pág. 203; *Ortiz v. Bermúdez*, 70 D.P.R. a la pág. 712.

En su sentencia, el Tribunal de Primera Instancia sugirió que debía inferirse que el apelado no estaba capacitado debido a que aceptó realizar un negocio en el que se le brindaron insuficientes garantías de pago. Lo cierto es que la esposa del apelado y el administrador designado por ellos también participaron en las negociaciones, sin que levantaran objeciones ante los términos de éstas. Ninguno de los dos estaba incapacitado.

La prueba reflejó que el apelado se vio obligado a vender su negocio debido a su enfermedad y que pudo haber estado confrontado problemas legales para esa época. Por su parte, los esposos Calo Álvarez se ofrecieron como garantizadores debido a que su hija deseaba adquirir las estaciones. No nos parece extraordinario que los apelantes hubieran deseado limitar su responsabilidad.

La sentencia del Tribunal de Primera Instancia también nos parece errada por otros fundamentos. Si, como entendió la distinguida Sala recurrida, el apelado está mentalmente incapacitado al grado que determinó el Tribunal, el procedimiento celebrado resulta nulo, ya que el apelado no cuenta con la capacidad para participar en el litigio.

El apelado, según hemos mencionado, compareció a nombre propio y no a través de otra persona en el procedimiento. No se desprende de los documentos ante este Tribunal que éste cuente con un tutor o que se le hubiera designado un defensor judicial, según lo requerido por la Regla 15.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 15.2; *Rivera y otros v. Bco. Popular*, 152 D.P.R. a la pág. 159. En estas circunstancias, el procedimiento carecería de validez.

En su sentencia, el Tribunal de Primera Instancia determinó que el apelado carecía de capacidad para consentir y que tanto los negocios celebrados el 8 de diciembre de 1995 como la transacción del 3 de febrero de 1997 resultaban nulos *ab initio*. Acto seguido, sin embargo, el Tribunal condenó a los apelantes a pagar al apelado el balance del precio aplazado impagado. Se trata de un patente contrasentido que carece de todo apoyo en nuestro ordenamiento.

El Art. 1255 del Código Civil de Puerto Rico dispone que declarada la nulidad de una obligación, los contratantes generalmente *"deben restituirse recíprocamente las cosas que hubiesen sido materia del contrato, con sus frutos, y el precio con los intereses"*. 31 L.P.R.A. sec. 3514; *Bosques v. Echevarría*, 163 D.P.R. ___ (2004), **2004 J.T.S. 158**, a la pág. 232; *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 182-183 (1985); *Robles v. Guzmán*, 67 D.P.R. 718, 723 (1947).

El Artículo 1256 aclara que *"[c]uando la nulidad proceda de la incapacidad de uno de los contratantes, no está obligado el incapaz a restituir sino en cuanto se enriqueció con la cosa o precio que recibiera"*. 31 L.P.R.A. sec. 3515.

En el presente caso, de admitirse la conclusión del Tribunal de Primera Instancia, la parte apelada vendría obligada a restituir a los apelantes el pago recibido en la transacción, así como los pagos posteriormente realizados por los esposos Calo Álvarez mediante la transacción del 3 de febrero de 1997, en la medida en que estos pagos hubieran beneficiado al apelado. ■

El Tribunal de Primera Instancia concluyó que los apelantes habían actuado dolosamente al contratar con los apelados, pero esta conclusión es irrazonable. Eran los apelados, no los apelantes, quienes tenían conocimiento preciso de la condición del apelado al momento de la transacción. No cabe imputar a los apelantes una voluntad de engañar a los apelados, a base de algo que les constaba a éstos. Véanse, *Bosques v. Echevarría*, **2004 J.T.S. 158**, a la pág. 232; *Colón v. Promo Motor Imports*, 144 D.P.R. 659, 666 (1997); *Márquez v. Torres Campos*, 111 D.P.R. 854, 871 (1982); *Acosta & Rodas, Inc. v. PRAICO*, 112 D.P.R. 583, 617 (1982); *Canales v. Pan American*, 112 D.P.R. 329, 338-342 (1982); *Miranda Soto v. Mena Eró*, 109 D.P.R. 473, 478 (1980).

Reconocemos que las determinaciones formuladas por el Tribunal de Primera Instancia, de ordinario, merecen deferencia por parte de los foros apelativos. *Colón y otros v. K-Mart y otros*, 154 D.P.R. 510, 520 (2001); *Orta v. Padilla*, 137 D.P.R. 927, 937 (1995). Pero ello no implica que la sentencia del Tribunal de Primera Instancia goce de credenciales de inmunidad frente la función revisora de este Tribunal. *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 545 (1984); *Vda. de Morales v. De Jesús Toro*, 107 D.P.R. 826, 829 (1978).

En el presente caso, estamos convencidos de que la decisión del tribunal apelado no representa el balance más racional, justiciero y jurídico de la evidencia desfilada. *Méndez v. Morales*, 142 D.P.R. 26, 36 (1996); *Abudo Servera v. A.T.P.R.*, 105 D.P.R. 728, 731 (1977).

Al contrario, debe concluirse que la parte apelada no derrotó la presunción de capacidad que establece la ley y que favoreció su otorgamiento de los contratos del 8 de diciembre de 1995 y la transacción suscrita por esa parte el 3 de febrero de 1997.

La parte apelada está obligada por los términos del acuerdo suscrito por ella, el que constituye cosa juzgada. 31 L.P.R.A. sec. 4827; *Neca Mort. Corp. v. A & W Dev. S.E.*, 137 D.P.R. 860, 872 (1995); *Citibank v. Dependable Ins. Co., Inc.*, 121 D.P.R. 503, 516 (1988).

Por los fundamentos expresados, se revoca la sentencia apelada y se declara sin lugar la demanda presentada. Se imponen las costas a favor de la parte apelante.

Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones